**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARK H. DICKSON,
                    *Plaintiff-Appellant,*

and

CAREY D. EBERT, Trustee in
Bankruptcy for Gravity, Inc.,
                    *Trustee-Appellant,*

and

403 WEST LOOP 820 N,
                    *Plaintiff,*                    No. 01-2458

v.

MICROSOFT CORPORATION; COMPAQ
COMPUTER CORPORATION; DELL
COMPUTER; PACKARD BELL NEC,
INCORPORATED,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-00-1247-JFM)

Argued: June 5, 2002

Decided: October 28, 2002

Before WILLIAMS and GREGORY, Circuit Judges, and
James H. MICHAEL, Jr., Senior United States District Judge
for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Williams wrote the majority opinion, in which Senior Judge Michael joined. Judge Gregory wrote a dissenting opinion.

---

**COUNSEL**

**ARGUED:** Michael K. Kellogg, KELLOGG, HUBER, HANSEN, TODD & EVANS, P.L.L.C., Washington, D.C., for Appellants. David Bruce Tulchin, SULLIVAN & CROMWELL, New York, New York; Paul M. Smith, JENNER & BLOCK, L.L.C., Washington, D.C., for Appellees. **ON BRIEF:** Mark C. Hansen, Steven F. Benz, Scott K. Attaway, KELLOGG, HUBER, HANSEN, TODD & EVANS, P.L.L.C., Washington, D.C.; R. Stephen Berry, J. Daniel Leftwich, Gregory Baruch, BERRY & LEFTWICH, Washington, D.C.; Nelson Roach, NIX, PATTERSON & ROACH, Daingerfield, Texas, for Appellants. Daryl A. Libow, Joseph J. Matelis, SULLIVAN & CROMWELL, New York, New York; Thomas W. Burt, Richard J. Wallis, Steven J. Aeschbacher, MICROSOFT CORPORATION, Redmond, Washington; Michael F. Brockmeyer, PIPER, MARBURY, RUDNICK & WOLFE, L.L.P., Baltimore, Maryland; Charles B. Casper, MONTGOMERY, MCCRACKEN, WALKER & RHOADS, L.L.P., Philadelphia, Pennsylvania; Steve W. Berman, HAGENS BERMAN, L.L.P., Seattle, Washington, for Appellee Microsoft. Susan R. Podolsky, JENNER & BLOCK, L.L.C., Washington, D.C.; Jerold S. Solovy, Barbara S. Steiner, JENNER & BLOCK, L.L.C., Chicago, Illinois; Samuel R. Miller, FOLGER, LEVIN & KAHN, L.L.P., San Francisco, California, for Appellee Dell; William D. Coston, Martin L. Saad, VENABLE, BAETJER, HOWARD & CIVILETTI, L.L.P., Washington, D.C., for Appellee Compaq; G. Brian Busey, MORRISON & FOERSTER, L.L.P., McLean, Virginia; Penelope A. Preovolos, MORRISON & FOERSTER, San Francisco, California, for Appellee Packard Bell.

---

**OPINION**

WILLIAMS, Circuit Judge:

   Mark H. Dickson and Carey D. Ebert, trustee in bankruptcy for Gravity, Inc., (collectively, Gravity) appeal the district court's dis-

missal under Federal Rule of Civil Procedure 12(b)(6) of Gravity's consumer class action claims against Microsoft Corporation and three original equipment manufacturers (OEMs) — Compaq Computer Corporation (Compaq), Dell Computer Corporation (Dell), and PB Electronics, Inc. (PB) (collectively, the OEM Defendants) — in the United States District Court for the District of Maryland. For the reasons set forth below, we affirm.

## I.

In February 1999, Gravity filed this action in the United States District Court for the District of Columbia, alleging a "hub-and-spoke" conspiracy between Microsoft and the OEM Defendants to restrain trade, in violation of § 1 of the Sherman Act, and a conspiracy to maintain Microsoft's alleged monopolies[1] in the sale of operating systems,[2] word processing, and spreadsheet software, in violation of § 2 of the Sherman Act.[3] The proposed class action consists of two separate classes. The first class is composed of "United States purchasers, between October 20, 1993 and the present, of Microsoft Windows or MS-DOS operating software . . . installed and sold with personal computers compatible with Intel x86/Pentium architecture purchased directly from Compaq, Dell, or [PB]." (J.A. at 103.) The second class is composed of "United States purchasers, between October 20, 1993 and the present, of Microsoft word processing software and/or Microsoft spreadsheet software installed and sold with personal computers

---

[1]The Supreme Court defines monopoly power as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). "More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level." *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (citing 2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 501, at 85 (1995)). As the D.C. Circuit noted, "merely possessing monopoly power is not itself an antitrust violation," but "it is a necessary element of a [Section 2] monopolization charge." *Id.*

[2]Operating systems function as platforms for software applications, such as word processing and spreadsheet programs.

[3]Gravity also asserted a class action claim against Microsoft individually for monopolization of case management and litigation support software, but Gravity has voluntarily dismissed this claim with prejudice.

compatible with Intel x86/Pentium architecture purchased directly from Compaq, Dell, or [PB]." (J.A. at 103.)

Gravity alleges that the OEM Defendants and Microsoft violated the Sherman Act by entering into licensing agreements with the following anticompetitive provisions: (1) a prohibition against removing icons, folders, or Start menu entries from the Windows desktop; (2) a prohibition against modifying the initial Windows boot sequence; (3) the integration of Internet Explorer (IE), Microsoft's Internet browser software, and other application software with Microsoft's operating software; and (4) the inclusion of long-term distribution contracts, exclusive dealing distribution arrangements, and per-processor license fees.[4]

In exchange for agreeing to these provisions, the OEM Defendants allegedly received various benefits, including discounts on software and "greater cooperation from Microsoft in product development." *Gravity, Inc. v. Microsoft Corp.*, 127 F. Supp. 2d 728, 732 n.5 (D. Md. 2001); *see also United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 42 (D.D.C. 1999) (stating that Compaq and several other OEMs enjoyed "early access to Windows source code"). Gravity also alleges that the agreements benefitted the OEM Defendants by allowing them to sell more computer hardware than they would have sold if the relevant software markets were competitive and by ensuring that the OEM Defendants would not be undercut by rivals offering either comparable hardware with lower-priced software or comparable hardware without software.

Gravity claims that the restrictive licensing agreements were predicated, at least in part, on the perceived threat from emerging "middleware" platforms. Gravity's theory is that middleware platforms feasibly could replace most operating software functions by allowing developers to write programs interfacing with middleware rather than

---

[4]Per-processor license fees are royalties that Microsoft requires the OEM Defendants to pay for personal computers that are sold pursuant to the licensing agreement containing a "particular microprocessor type." *United States v. Microsoft Corp*, CIV. A. 94-1564, 1995 WL 505998, at *2 (D.D.C. Aug. 21, 1995).

the operating system.[5] *United States v. Microsoft Corp.*, 253 F.3d 34, 74 (D.C. Cir. 2001). The D.C. Circuit has explained the threat of middleware platforms to Microsoft's monopoly in the operating systems market as follows:

> If a consumer could have access to the applications he desired — regardless of the operating system he uses — simply by installing a particular browser on his computer, then he would no longer feel compelled to select Windows in order to have access to those applications; he could select an operating system other than Windows based solely upon its quality and price. In other words, the market for operating systems would be competitive.

*Id.* at 60. Gravity also alleges that Microsoft has faced challenges from competing operating software, such as DR-DOS.

The restraints on trade in the licensing agreements allegedly have denied the class members the choice of competitive software products and have resulted in supracompetitive prices for Microsoft's operating system and application software. Gravity does not allege any conspiracy between Microsoft and the OEM Defendants to set the resale price of the software. Instead, it claims that overcharges were passed on to the consumers by the OEM Defendants when the consumers purchased personal computers (PCs) from the OEM Defendants.

Microsoft and the OEM Defendants moved to dismiss the First Amended Complaint (FAC). While those motions were under submission, the Judicial Panel on Multidistrict Litigation transferred the action to the United States District Court for the District of Maryland, where it was coordinated with approximately sixty-four other antitrust actions against Microsoft. The other antitrust actions were consolidated into a single class action. Gravity's complaint was not consolidated with these actions because it was the only complaint alleging claims against OEMs as defendants. *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 704 & n.2 (D. Md. 2001).

---

[5]Netscape Navigator and the Java programming language are examples of middleware products written for multiple operating systems.

In January 2001, the district court dismissed Gravity's FAC for failure to state a claim. Following this dismissal, Gravity moved for leave to file a Second Amended Complaint (SAC). In the SAC, Gravity alleged two separate vertical conspiracies between Dell and Microsoft and Compaq and Microsoft.[6] Gravity did not name PB as a defendant.[7] Gravity repeated its allegations of anticompetitive conduct and included a claim that Microsoft's licensing agreements "bundl[ed] or t[ied] the distribution of Microsoft's middleware, the Internet Explorer browser, with Microsoft's Windows operating software." (J.A. at 465.) The district court denied leave to file the SAC on the ground of futility, concluding that the SAC also failed to state a claim upon which relief could be granted.

On appeal, Gravity contends that both complaints allege proper claims under § 1 and § 2 of the Sherman Act. Gravity also argues that the district court erred in applying the indirect purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), to foreclose compensatory damages. We address each argument in turn.

## II.

Before turning to our consideration of Gravity's claims of error, a brief overview of the public enforcement action for injunctive relief brought by the federal government and nineteen states against Microsoft in the United States District Court for the District of Columbia is warranted.[8] *See United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001). In analyzing the § 2 claim against Microsoft, the D.C. Circuit upheld the district court's finding that Microsoft has monopoly power in the market for operating system software for Intel-compatible PCs with its Windows software, which has gained more

---

[6]For a discussion of the distinction between a "hub-and-spoke" conspiracy and separate vertical conspiracies, see *infra* at 9-10.

[7]Gravity did not allege a separate conspiracy between Microsoft and PB in the SAC because none of the named plaintiffs purchased a PC from PB. (Appellant's Br. at 20 n.5.)

[8]Although Gravity's complaint was filed prior to resolution of the public enforcement action, the factual predicate is similar, and on appeal, Gravity relies upon many of the D.C. Circuit's findings for general support for its propositions.

than 95% market share. *See id.* at 51-58. It further affirmed the district court's finding that Microsoft had "engag[ed] in exclusionary [or anticompetitive] conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident'" for the purpose of maintaining its monopoly power in the operating systems market. *Id.* at 58. In detailing Microsoft's anticompetitive conduct, the D.C. Circuit relied primarily on the same licensing agreements underlying Gravity's complaint, although it focused on Microsoft's dealings with all of the OEMs who entered into such agreements in the aggregate rather than two or three agreements in isolation. Specifically, the D.C. Circuit highlighted the prohibitions against: "(1) removing any desktop icons, folders, or 'Start' menu entries; (2) altering the initial boot sequence; and (3) otherwise altering the appearance of the Windows desktop."[9] *Id.* at 61. It affirmed the district court's conclusion that Microsoft used the restrictions in the licensing agreements to ensure the predominance of IE in the browser market, thereby gaining market share in the browser market for the purpose of maintaining Microsoft's monopoly in the operating systems market.[10] Only the third restriction was held to have been justified by Microsoft's need to protect its copyrighted work. *Id.* at 63. The D.C. Circuit held that the first two restrictions "represent uses of Microsoft's market power to protect its monopoly, unredeemed by any legitimate justification" and, therefore, that Microsoft's imposition of these restrictions violated § 2 of the Sherman Act. *Id.* at 64.

### III.

With this background in mind, we evaluate the district court's dismissal of Gravity's complaint. When reviewing the district court's grant of a motion to dismiss a Sherman Act complaint pursuant to

---

[9]For example, the licensing agreements prohibited OEMs from causing any user interface other than the Windows desktop to launch automatically and from adding icons or folders different in size or shape from those supplied by Microsoft.

[10]For a detailed discussion of the relationship between the browser and the operating systems markets and the anticompetitive effect of the license restrictions on the OEMs' ability to promote rival browsers, see *Microsoft*, 253 F.3d at 59-64.

Federal Rule of Civil Procedure 12(b)(6), "we must determine whether allegations covering all the elements that comprise the theory for relief have been stated as required." *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 220 (4th Cir. 1994) (internal quotation marks omitted) (citing *United States v. Employing Plasterers Ass'n*, 347 U.S. 186, 189 (1954)); *Mun. Utils. Bd. of Albertville v. Ala. Power Co.*, 934 F.2d 1493, 1501 (11th Cir. 1991) ("A plaintiff must plead sufficient facts so that each element of the alleged antitrust violation can be identified."). "Moreover, the allegations must be stated in terms that are neither vague nor conclusory." *Estate Constr. Co.*, 14 F.3d at 220-21. "Although we will assume that the plaintiffs can prove the facts that they allege in their complaint, 'it is not . . . proper to assume that . . . the defendants have violated the antitrust laws in ways that have not been alleged.'" *Id.* at 221 (quoting *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983)).

At the outset, we note that although Gravity alleges violations of both § 1 and § 2, the district court did not separately examine the sufficiency of Gravity's claims when it dismissed the FAC. The district court determined that the alleged § 1 and § 2 conspiracies were "coterminous" because they purportedly shared a common goal: maintaining Microsoft's monopolies. *Gravity*, 127 F. Supp. 2d at 455. Because the conspiracies "coalesce," reasoned the district court, the sufficiency of both allegations "must be gauged by the elements of a section 2 claim." *Id.* "Otherwise, plaintiffs could circumvent the requirements of a conspiracy to monopolize claim, including the requirement that a defendant be shown to have acted with the specific intent to monopolize, simply by characterizing their claim as one arising under section 1, whose elements of proof are not as stringent." *Id.* We disagree with the district court's reasoning in this regard. A § 1 violation "is legally distinct from that under § 2 . . . though the two sections overlap in the sense that a monopoly under § 2 is a species of trade restraint under § 1." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940). The same kind of practices, therefore, may evidence violations of both. *See Md. & Va. Milk Pro. Ass'n v. United States*, 362 U.S. 458, 463 (1960) ("[S]ections [1 and 2] closely overlap, and the same kind of predatory practices may show violations of [both]."); E. Thomas Sullivan & Jeffrey L. Harrison, *Understanding Antitrust and its Economic Implications* § 6.08, at 258 (2d

ed. 1994) ("[The prohibition in § 2 against combinations or conspiracies] proscribes a great deal of the same behavior prohibited by § 1). Thus, even if Gravity failed to allege a § 2 claim, it is possible that it sufficiently alleged a § 1 claim. *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) (describing the § 2 standard as "the more stringent monopoly standard").

To establish a violation of § 1 of the Sherman Act,[11] Gravity must prove the following elements: (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade. *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991) (en banc). If Gravity is able to prove a violation of § 1, it then must prove the existence of "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002); *Oksanen*, 945 F.2d at 708; *see generally* 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶¶ 360-63, at 191-227 (1995). These requirements apply with equal force to Gravity's claims for damages and injunctive relief; the only relevant distinction being that for injunctive relief, "the injury itself need only be threatened." 2 Areeda & Hovenkamp ¶ 360b, at 193.

### A.

With respect to the first element, in the FAC, Gravity alleged a single "hub-and-spoke," or "rimless wheel" conspiracy among the OEM Defendants and Microsoft. A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction. *Kotteakos v. United States*, 328 U.S. 750, 755 (1946) ("[T]he pattern was that of separate spokes meeting at a common center, though we may add without the rim of the wheel to enclose the

---

[11]Section 1 states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C.A. § 1 (West 1997).

spokes." (internal quotation marks omitted)). In *Kotteakos*, the Supreme Court made clear that a rimless wheel conspiracy is not a single, general conspiracy but instead amounts to multiple conspiracies between the common defendant and each of the other defendants. *Id.* at 768-69, 772; Joseph F. McSorley, *A Portable Guide to Federal Conspiracy Law* 145 (1996) ("While the hub may view its dealings with the spokes as part of a single agreement, a spoke may be concerned simply with his or her own actions.").

Gravity does not argue that it is able to meet the test for establishing a "rim" between the OEM Defendants and Microsoft.[12] (Appellant's Br. at 53.) Instead, it urges us to follow the Sixth Circuit, which Gravity asserts has adopted the proposition that a rimless wheel conspiracy constitutes a single, general conspiracy in the context of the Sherman Act. *See Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*, 459 F.2d 138, 146 (6th Cir. 1972) (setting forth requirements for proving "rimless wheel" conspiracy); *see also Impro Products, Inc. v. Herrick*, 715 F.2d 1267, 1279 n.14 (8th Cir. 1983) (noting that "[t]here is some question whether the conspiracy provisions of Sections 1 and 2 of the Sherman Act apply to a hub-and-spoke conspiracy," but declining to resolve the issue after suggesting that such a theory was appropriate). Nothing in the Supreme Court's holding in *Kotteakos*, however, suggests that such a proposition is correct or permissible. Rather, the Supreme Court was clear: a wheel without a rim

---

[12]A single criminal conspiracy generally is demonstrated by an "overlap of key actors, methods, and goals." *United States v. Strickland*, 245 F.3d 368, 385 (4th Cir. 2001) (internal quotation marks and citations omitted); *see also United States v. Bowens*, 224 F.3d 302, 308 (4th Cir. 2000) (holding that it was not error for the district court to refuse to instruct the jury on multiple conspiracies where there was evidence of common methods of operation and common participants linked by a mutual interest); *United States v. Squillacote*, 221 F.3d 542, 574 (4th Cir. 2000) ("A single conspiracy exists where there is one overall agreement, or one general business venture." (internal quotation marks omitted)). Because Gravity does not argue that its allegations are sufficient to demonstrate this type of overlap but instead only advocates our adopting the concept of a rimless wheel conspiracy, we need not decide whether the same test that applies to demonstrate a single criminal conspiracy would apply in the context of the Sherman Act.

is not a single conspiracy.[13] *Kotteakos*, 328 U.S. at 755. Thus, we agree with the district court that Gravity's attempt in its FAC to plead a single, rimless wheel conspiracy between the OEM Defendants and Microsoft must be rejected.

In an effort to cure its failure to allege a legally viable conspiracy, Gravity alleged in the SAC separate vertical conspiracies between Microsoft and Compaq and between Microsoft and Dell. Compaq and Dell argue that these allegations also are insufficient to demonstrate concerted action under § 1 because Gravity is unable, as a matter of law, to demonstrate that either shared with Microsoft "a unity of purpose or a common design and understanding." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal quotation

---

[13]The dissent's confusion in applying *Kotteakos* is understandable by reference to its reliance on the Sixth and Eighth Circuits, both of which appear to have misinterpreted *Kotteakos*. *Post* at 30-31 (citing *Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*, 459 F.2d 138 (6th Cir. 1972); *Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1279 (8th Cir. 1983)). In *Elder-Beerman*, the Sixth Circuit stated that "[t]here is much discussion in the *Kotteakos* decision indicating the possibility that such a 'rimless wheel' theory might be used in a civil case though not appropriate in a criminal case." *Elder-Beerman*, 459 F.2d at 147. In *Impro Products*, the Eighth Circuit compounded the Sixth Circuit's error by describing the test set forth in *Elder-Beerman* for a rimless wheel conspiracy (which is adopted by the dissent, post at 29-30) and then concluding that a rimless wheel conspiracy constitutes a single conspiracy in civil actions. *Impro Prods.*, 715 F.2d at 1279 & n.14. Nothing in *Kotteakos* suggests, however, that the definition of a rimless wheel conspiracy turns on whether the conspiracy is civil or criminal in nature; the Sixth and the Eighth Circuits' contrary belief apparently stems from the distinction between criminal and civil actions that was drawn in *Kotteakos* for purposes of analyzing harmless error.

In any event, even if we were to further distort the clear holding set forth in *Kotteakos* by following the Sixth and Eighth Circuits in the manner suggested by the dissent, our resolution of Gravity's claims would be unaffected. Regardless of whether Gravity has alleged a single conspiracy among the OEM Defendants and Microsoft or two separate agreements, its § 1 and § 2 claims would be subject to dismissal for failure to allege facts demonstrating a significant likelihood of anticompetitive effects.

marks and citation omitted). As this court recently emphasized in *Virginia Vermiculite, Ltd. v. HGSI*, ___ F.3d ___, 01-1850 (4th Cir. Oct. 4, 2002), "concerted activity susceptible to sanction by section 1 is activity in which multiple parties join their resources, rights, or economic power together in order to achieve an outcome that, but for concert, would naturally be frustrated by their competing interests (by way of profit-maximizing choices)." *Id.* at *9. Gravity has sufficiently alleged that Microsoft and the OEM Defendants pooled their resources, rights, or economic power. Furthermore, to the extent Compaq and Dell argue that it was against their economic interests to enter into § 1 conspiracies with Microsoft, we note that Gravity has alleged that Compaq and Dell received financial and other benefits in exchange for entering into the licensing agreements. These allegations are sufficient for purposes of Rule 12(b)(6) to demonstrate that a § 1 conspiracy was economically plausible.[14] *Cf., e.g.*, *Spectators' Communication Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 220-22 (5th Cir. 2001) (analyzing relevant caselaw and concluding that a vertical conspiracy could be shown under § 1 even though it likely would be against Anheuser-Busch's economic interest to conspire to restrain competition in a market in which it was a purchaser).

Moreover, "the 'combination or conspiracy' element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion." *MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 973 (7th Cir. 1995); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 615 (7th Cir. 1997) (noting that the wholesaler's participation would be actionable even if the jury found that they "were tools of the manufacturers — reluctant accomplices, yet not the less liable for that."); *see also United States v. United States Gypsum Co.*, 438 U.S. 422, 436 n.13 (1978) ("[T]he general

---

[14]Arguably, however, these allegations are insufficient as a matter of law to demonstrate that either Compaq or Dell possessed specific intent to maintain Microsoft's alleged monopolies under § 2. *See TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1026-27 (10th Cir. 1992) ("Because the cable operators would have no rational motive to create [a monopolistic environment], TVCN's allegations do not provide an inference of specific intent to conspire to achieve the stated goal of the conspiracy.").

rule [is] that a civil violation can be established by proof of either an unlawful purpose or an anticompetitive effect."). The co-conspirators need not share the same motive or goal; it is sufficient to allege that the co-conspirators "acquiesc[ed] in an illegal scheme." *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948); *see also Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541 (4th Cir. 1998) ("It is not necessary that [Historic Green Springs, Inc.] have shared Grace's alleged anticompetitive motive in entering into a proscribed restraint; it is sufficient that HGSI, regardless of its own motive, merely acquiesced in the restraint with the knowledge that it would have anticompetitive effects."); *Duplan Corp. v. Deering Milliken Inc.*, 594 F.2d 979, 982 (4th Cir. 1979) ("Where, as here, the [defendants] were knowing participants in a scheme whose effect was to restrain trade, the fact that their motives were different from or even in conflict with those of the other conspirators is immaterial."). Accordingly, Gravity's allegations regarding the commercial license agreements are sufficient for purposes of 12(b)(6) to set forth two separate vertical conspiracies between Microsoft and Compaq and between Microsoft and Dell.

## B.

We next address whether Gravity alleged facts which, if proven true, would establish that the two conspiracies separately imposed unreasonable restraints of trade in interstate commerce. *Continental Airlines*, 277 F.3d at 508. In assessing liability under § 1, courts generally evaluate agreements pursuant to one of three approaches. *Id.* at 508-09 ("[T]he Supreme Court has authorized three methods of analysis: (1) per se analysis, for obviously anticompetitive restraints, (2) quick-look analysis, for those with some procompetitive justification, and (3) the full 'rule of reason,' for restraints whose net impact on competition is particularly difficult to determine."). Because the possibility of anticompetitive effects resulting from either licensing agreement is not obvious, we analyze the two licensing agreements at issue — individually — pursuant to the "full" rule of reason analysis.[15]

---

[15]Justice Brandeis in *Chicago Bd. of Trade v. United States*, 246 U.S. 231 (1918), explained the rule of reason as follows:

The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or

*Id.*; *cf., e.g.*, *Microsoft*, 253 F.3d at 59-60 (applying full rule of reason analysis to claimed § 2 violations).

In the rule of reason analysis, "the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Oksanen*, 945 F.2d at 708. This evaluation requires a showing of "anticompetitive effect" resulting from the agreement in restraint of trade. To have an "anticompetitive effect," conduct "must harm the competitive *process* and thereby harm consumers." *Microsoft*, 253 F.3d at 58. "[H]arm to one or many competitors will not suffice." *Id.* "The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Id.* (internal quotation marks omitted). Thus, an inquiry into the lawfulness of the restraint begins "by identifying the ways in which a challenged restraint might possibly impair competition." 7 Areeda & Hovenkamp ¶ 1503a, at 372. After identifying the type of possible harm to competition alleged, we must proceed "to determine whether that harm is not only possible but likely and significant," which requires "examination of market circumstances," including market power and share. 7 *id.* ¶¶ 1503a-1503b, at 374-77.

1.

Gravity alleges that Compaq's and Dell's agreements with Microsoft aided the maintenance of Microsoft's monopolies in PC operating system, word processing, and spreadsheet markets. Aiding the main-

---

whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Id.* at 238.

tenance of a monopoly theoretically could harm competition by affecting price and/or output in various ways. For instance, the agreements could allow Microsoft to leverage its market power in the relevant software markets to obtain advantage in some secondary market (such as the browser market), not based upon consumer choice or efficient performance but from the mere fact of Microsoft's market power in the primary market. *See Microsoft*, 253 F.3d at 62-66 (finding anticompetitive effects resulting from Microsoft's licensing agreements with OEMs based upon Microsoft's leveraging of monopoly power in operating system market to suppress competition in the browser market); *see generally* Robin Cooper Feldman, *Defensive Leveraging in Antitrust*, 87 Geo. L.J. 2079, 2080, 2098 (1999) (discussing "traditional leveraging theory" and the "Chicago school" leveraging theory and concluding that "defensive leveraging" can create the potential for harm to consumers by aiding in the maintenance of the primary monopoly). Similarly, with respect to the exclusive dealing components of the licensing agreements, the potential harm to consumers is that rival software firms or browsers will be foreclosed from access to consumers, denying consumers competitive choice and allowing supracompetitive pricing with respect to the software markets for which Microsoft has monopoly power. Per-processor fees also arguably could "discourage OEMs from licensing competing operating systems and/or cause OEMs to raise the price for PCs with a competing operating system to recoup the fee paid to Microsoft," theoretically resulting in increased prices for Microsoft's software and decreased opportunities for rival software firms to gain access to consumers. *United States v. Microsoft Corp.*, 159 F.R.D. 318, 323 (D.D.C. 1995), *rev'd on other grounds*, 56 F.3d 1448 (D.C. Cir. 1995); *see generally* Kenneth C. Baseman et al., *Microsoft Plays Hardball: The Use of Exclusionary Pricing and Technical Incompatibility to Maintain Power in Markets for Operating System Software*, 40 Antitrust Bull. 265, 267-68 (1995) (criticizing per-processor licenses).

"Theorizing about conceivable impairments of competition does not, of course, prove that any such impairment has occurred or is likely," or much less is "substantial in magnitude."[16] 7 Areeda &

---

[16]Nor do we suggest whether any such anticompetitive effect, if shown to be likely and substantial in magnitude, would be outweighed by a pro-

Hovenkamp ¶ 1503a, at 373. Thus, we next must examine whether Gravity sufficiently has alleged the likelihood of a substantial anticompetitive harm caused by the two licensing agreements at issue (considered individually), an inquiry that requires Gravity to allege facts demonstrating "that the defendants played a significant role in the relevant market." *Oksanen*, 945 F.2d at 709; *see also General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 596 (7th Cir. 1984) (stating that in rule of reason analysis, the plaintiff must "prove that the defendant has sufficient market power to restrain competition substantially. . . . If not, the inquiry is at an end; the practice is lawful"); 7 Areeda & Hovenkamp ¶ 1503b, at 376 ("[V]irtually all courts applying the rule of reason require the plaintiff . . . to show, at a minimum, that the defendants play a significant role in th[e] [allegedly restrained] market.").

2.

Gravity has provided allegations of Microsoft's market power in the relevant software markets, in the form of Microsoft's shares in these markets.[17] Gravity failed, however, to allege facts regarding

competitive justification. *See, e.g.*, *Microsoft*, 253 F.3d at 59 (noting, under traditional rule of reason analysis, if the plaintiff successfully demonstrates anticompetitive effect, then the burden shifts to the defendant to proffer a procompetitive justification for its conduct).

[17]Gravity alleged that Microsoft "maintained a monopoly share (in the range of 90%) in the personal computer operating software market" throughout the "class periods," (J.A. at 473), and maintained a market share in the range of 80-90% in the word processing and spreadsheet software markets throughout the class period. For antitrust purposes, market power "is the power to force a purchaser to do something that he would not do in a competitive market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992) (internal quotation marks omitted). "It has been defined as the ability of a single seller to raise price and restrict output." *Id.* (internal quotation marks omitted). Market share is defined as "[t]he percentage of a market that is controlled by a firm." Black's Law Dictionary 971 (6th ed. 1991). Market power generally is identified, in part, by examining market share. *See, e.g.*, Andrew Chin, Note, *Antitrust by Chance: A Unified Theory of Horizontal Merger Doctrine*, 106 Yale L.J. 1165, 1169-72 (1997) (discussing movement away from strict reliance on calculation of market share in antitrust analysis). For purposes of Rule 12(b)(6), we consider Gravity's allegations regarding Microsoft's market share sufficient to allege Microsoft's power in the relevant software markets.

Compaq's or Dell's market share and concedes that the PC market is "fiercely competitive" and, therefore, that neither Compaq nor Dell has power in the PC market.[18] *Gravity*, 168 F. Supp. 2d at 544; *see also Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 761 (7th Cir. 1996) (Easterbrook, J.) ("Computer manufacturers are vigorous rivals; prices drop daily; this is one of our economy's most competitive sectors."). Gravity further concedes that "[t]he only thing that . . . distinguishes [Compaq and Dell] from other OEMs is the alacrity with which they acquiesced in accepting [the licensing] agreements to obtain relatively favorable prices from Microsoft for its products." *Gravity*, 168 F. Supp. 2d at 544. Given Gravity's concession that the PC market is "fiercely competitive," and in light of Microsoft's agreements with other OEMs, Gravity is unable, as a matter of law, to demonstrate that Microsoft's agreements with Compaq and Dell, when considered individually, are capable of causing any substantial harm to competition. For instance, without having alleged Compaq's or Dell's power or share in the PC market, Gravity is unable to demonstrate that rival software firms' access *to Compaq or Dell* was an important component of those firms' potential ability to compete in the software markets, or that Microsoft's agreements with Compaq and Dell substantially hindered the entrance or operation of these rivals in the software markets or denied them access to a significant number of consumers of software. Similarly, given the failure to allege the market power of Compaq or Dell, Gravity is unable to show that Compaq or Dell has forced, or is likely to be able to force, supracompetitive prices on consumers for undesirable software features. Consequently, assuming that Compaq and Dell each possessed an insignificant portion of the PC market and no ability to control

---

[18]Gravity contends that because the relevant markets are in software, there is no need to evaluate Compaq's or Dell's power in the PC market. Compaq's and Dell's power in the PC market is critical in the analysis, however, because both OEMs pre-install Microsoft's software on their PCs; neither operates independently in the software market. Thus, Compaq's and Dell's ability to influence competition in the relevant software markets through their separate agreements with Microsoft is dependent on their ability to influence competition in the PC market. *Cf. Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 18 (1984) ("[A]ny inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact.").

pricing or output in the PC market (as is proper in light of Gravity's failure to allege market share or any other facts demonstrating market power), the two licensing agreements — considered individually — would be incapable of succeeding in maintaining or leveraging Microsoft's alleged monopolies, in that neither agreement could substantially reduce the usage share of, or prevent the promotion of, rival browsers, rival operating system software manufacturers, or rival applications software manufacturers.[19] *Cf., e.g.*, *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 52 n.19, 54 (1977) (concluding that, although a contractual requirement that distributors sell Sylvania television sets from authorized locations limited competition among the distributors in the resale of Sylvania televisions ("intrabrand competition"), it ultimately *promoted competition* with other brands of television sets ("interbrand competition") and stating that the competitiveness of the interbrand market "provides a significant check on the exploitation of intrabrand market power"); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13-14 (1984) ("we have condemned tying arrangements when the seller has some special ability — usually called 'market power' — to force a purchaser to do something that he would not do in a competitive market"); *id.* at 16 ("If only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law . . . . [W]e have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed

---

[19]Gravity asserts that it need not show that Microsoft's agreements with Compaq and Dell were each a sole cause of any anticompetitive effects but need show only that the agreements were each a "material cause" of anticompetitive effects. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) ("It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4."). Without an allegation of market share or market power of either Compaq or Dell, however, Gravity cannot make the latter showing. *Cf. Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 487-88 (1977) (holding that an antitrust claim fails as a matter of law when the plaintiff would have suffered the identical loss without regard to the claimed anticompetitive conduct); 2 Areeda & Hovenkamp ¶ 363a-b, at 219-23 (noting that no material cause can be demonstrated where an independent cause fully accounts for the claimed antitrust injury).

thereby."); *id.* at 37-38 (O'Connor, J., concurring) (evaluating tie-ins and noting that to show an adverse impact on consumers, the plaintiff generally must demonstrate two things: market power in the tying-product market and a threat that the seller will acquire market power in the tied-product market); *Digital Equip. Corp.*, 73 F.3d at 761 (Easterbrook, J.) ("Let us ask, then, whether the inclusion of an [operating system] with one's [PC] — 'tie-in' or not — is a means to reduce output and create monopoly profits. Unless the seller has market power, the answer is no . . . ."); *id.* at 762 ("In a competitive market a pig-headed refusal to satisfy customers' preferences, or an attempt to charge for unwanted items, does not lead to monopoly prices; instead it leads to ruin as rivals step in to take the business."). Moreover, with respect to the exclusive dealing component of Gravity's claim, absent an allegation regarding Compaq's or Dell's power or share in the PC market, there is no basis in Gravity's complaint for concluding that either of the two licensing agreements at issue, when considered individually, are likely to foreclose a significant share of the relevant software markets. *See Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (holding that an exclusive contract does not violate the Clayton Act unless its probable effect is to "foreclose competition in a substantial share of the line of commerce affected"); *Microsoft*, 253 F.3d at 68-70 (discussing the exclusive dealing aspects of Microsoft's agreements and concluding that, even when the cumulative effect of Microsoft's agreements were considered, the agreements did not foreclose enough of the relevant browser market to constitute a § 1 violation).

The district court afforded Gravity ample opportunity to allege facts demonstrating Compaq's or Dell's power in the PC market, but Gravity refused, contending for various reasons that Compaq's and Dell's power and share in the PC market is immaterial to Compaq's and Dell's (separate) ability to influence competition in the relevant software markets.[20] On appeal, it continues to assert that, as a matter

---

[20]Gravity did allege that Compaq and Dell were the "largest PC makers" and were "among the largest distributors of Microsoft's products." (Appellant's Br. at 11.) The dissent relies on this as a sufficient allegation of Compaq and Dell's respective influences in the PC market. *Post* at 34. Being the "largest" in a relevant market, however, says nothing of a firm's ability to affect competition in that market. For example, Com-

of law, Compaq's and Dell's power in the PC market is irrelevant to its § 1 claim because Microsoft's monopoly power, in a variety of ways, is adequate to demonstrate the likelihood of substantial anti-competitive effects. We address each argument below.

Gravity first argues that Microsoft's significant market power in the software markets is sufficient to demonstrate anticompetitive effects in those markets without regard to Compaq's or Dell's power or share in the PC market. The relevant focus of the § 1 inquiry, how-ever, is the anticompetitive effects of the conspiracy qua conspiracy; therefore, the plaintiff must demonstrate that the conspiratorial agree-ment itself affected competition in ways that would not have obtained absent the agreement. *Spectators' Communication Network*, 253 F.3d at 225 (noting that the issue is "whether the combination or conspir-acy, not each individual conspirator, has the [market] power to hurt competition in the relevant market."); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986) ("[T]he purpose of the inquiries into market definition and market power is to determine whether *an arrangement* has the potential for genuine adverse effects on competition." (empha-sis added)). To be sure, one can imagine circumstances in which the allegation of one conspirators' market power is sufficient to demon-strate a likelihood of anticompetitive effects. For instance, assuming as true Gravity's allegations regarding Microsoft's market share in the relevant software markets, had Microsoft agreed to sell its software *only* to Compaq and Dell, such an agreement would have had the potential to harm competition in software markets, and ultimately in

_____

paq and Dell each may possess only five percent of the market share, whereas many other OEMs each possess four percent of the market share, in which case, despite being the largest PC makers and software distributors, neither Compaq nor Dell would have the ability, through their separate conspiracies with Microsoft, to affect competition in the relevant software markets. *Cf., e.g.*, *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26 & n.43 (1984) (holding, as a matter of law, that thirty percent share of the relevant market is insufficient to confer market power). Accordingly, Gravity's allegations that Compaq and Dell were the largest PC makers and software distributors provide no basis whatso-ever to conclude that either had sufficient share of the PC market to affect competition in the relevant software markets.

the PC market, irrespective of Compaq's or Dell's power or share in the PC market. No such arrangement, however, is alleged here.

Gravity next argues that the district court should have evaluated Microsoft's "exclusionary conduct both inside and outside the combinations alleged," and the potential for anticompetitive effects resulting from this conduct in the aggregate. (Appellant's Br. at 49-50.) The SAC, however, did not allege a conspiracy among Microsoft and all OEMs; it alleged discrete conspiracies between Microsoft and Compaq and Microsoft and Dell. Consequently, the district court correctly determined that it could not consider the cumulative harm of Microsoft's agreements with all OEMs but instead was required to consider — individually — Microsoft's agreements with Compaq and Dell to evaluate each agreement's potential for anticompetitive effects.[21]

Likewise, it is untrue that Compaq and Dell, as alleged co-conspirators of Microsoft, are responsible for all of Microsoft's unilateral acts with other OEMs who were not members of the alleged conspiracies. As noted above, each licensing agreement must be treated as a separate conspiracy, and only acts taken in furtherance of that alleged conspiracy are appropriately considered in determining the adverse effects of the claimed restraints on trade, not acts of one conspirator taken in furtherance of other possible, distinct conspiracies. *Cf. United States v. Bonetti*, 277 F.3d 441, 447 (4th Cir. 2002) (noting, in a criminal conspiracy, that a co-conspirator is liable for "all substantive offenses of his co-conspirator that are both reasonably foreseeable and in furtherance of the conspiracy"); *cf. also United States v. Santiago*, 906 F.2d 867, 872-73 (2d Cir. 1990) (concluding that the single conspiracy test applies to determine whether co-conspirator conduct is reasonably foreseeable and in furtherance of

---

[21]The cumulative harm of Microsoft's actions "outside" the two licensing agreements at issue has been subject to review in the public enforcement action and will be further subject to review in the consumer class actions brought against Microsoft individually and in any suits brought by OEMs against Microsoft. As noted above, *supra* at 19-20, the focus of this § 1 inquiry is not Microsoft's actions standing alone, but the extent to which its concerted actions with each of the two individual OEMs promoted Microsoft's monopoly power or otherwise restrained trade.

the conspiracy); *United States v. Gooden*, 892 F.2d 725 (8th Cir. 1989) (same). Indeed, to hold otherwise would be to suggest that the distinction between a single conspiracy and multiple conspiracies involving a common defendant is one without a difference.

Thus, we agree with the district court that for Gravity to state a viable § 1 claim, it was required to allege facts which, if proven true, would demonstrate that Compaq's or Dell's individual agreements with Microsoft were likely to result in an anticompetitive effect. Without alleging facts demonstrating Compaq's or Dell's power or share in the PC market, Gravity was unable to make such a showing.

Similarly, without allegations regarding the market power or share of Compaq or Dell in the PC market, Gravity is unable to show a conspiracy to monopolize under § 2.[22] *See* 3A Areeda & Hovenkamp ¶ 809, at 370 ("[I]n those instances where power is a prerequisite to holding an agreement to be an unreasonable restraint of trade [under § 1] . . . it would make no sense to hold the same agreement offensive to § 2 without proof of power."). The offense of monopolization requires a showing of "anticompetitive effect." *Microsoft*, 253 F.3d at 58. Thus, a viable § 2 conspiracy to monopolize claim must include allegations which, if proven true, would establish that the agreements Compaq and Dell made with Microsoft could have had an anticompetitive effect (when considered separately). *See, e.g.*, *id.* at 50 (discussing the meaning of "monopolization" within § 2); *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993) (listing the likelihood of an anticompetitive effect as one of the elements of a conspiracy to monopolize under § 2); *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1576 (11th Cir. 1991) ("[A] section 1 claim and a section 2 conspiracy to monopolize claim require the same threshold showing — the existence of an agreement to restrain

---

[22]Section 2 states:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nationals, shall be deemed guilty of a felony . . . .

15 U.S.C.A. § 2 (West 1997).

trade."). Accordingly, for the reasons set forth above regarding the inadequacies in Gravity's § 1 allegations, Gravity's § 2 claim also fails as a matter of law.

Gravity suggests that these conclusions are irreconcilably at odds with the D.C. Circuit's conclusions in the public enforcement action, contending that the D.C. Circuit implicitly recognized that Microsoft's licensing agreements with Compaq and Dell violated § 1. This contention, however, misapprehends the nature of the D.C. Circuit's holding. Notably, the district court in the public enforcement action held that the exclusive dealing arrangements in Microsoft's licensing agreements, including its agreement with Compaq, did not violate § 1 under the rule of reason, concluding "that Microsoft's arrangements with various firms did not foreclose enough of the relevant market to constitute a § 1 violation." *United States v. Microsoft*, 87 F. Supp. 2d 30, 53 (D.D.C. 2000). The only § 1 violation found by the district court was based upon Microsoft's alleged tying of Windows and IE, and the D.C. Circuit vacated that ruling. *Microsoft*, 253 F.3d at 84-95. Moreover, in conducting its § 2 analysis, the D.C. Circuit evaluated the anticompetitive effects of Microsoft's licensing agreements with *all* OEMs. Of course, as is set forth above, the analysis of anticompetitive effects depends on the identification of the defendants' "significant role" within the relevant market — an inquiry that is much different when examining the cumulative harm of Microsoft's conduct than it is when examining the effects of Microsoft's individual agreements with two OEMs for which Gravity declines to provide information regarding market share or power. Thus, nothing in the public enforcement action suggests that Gravity's § 1 and § 2 claims are viable.

We recognize that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles," *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473 (1962), and that an antitrust complaint should not be dismissed at the Rule 12(b)(6) stage "merely because the court doubts the plaintiff will ultimately prevail," *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 145 n.8 (4th Cir. 1990) (internal quotation marks omitted). Nevertheless, to avoid dismissal for failure to state a claim, the plaintiff must "colorably state[ ] facts which, if proven, would entitle him to relief." *Id.* (internal quotation marks omitted).

We consistently have held this to require an allegation of facts supportive of each element of the plaintiff's antitrust claim. *Estate Constr. Co.*, 14 F.3d at 220 (holding that "notice pleading" requires "allegations covering all the elements that comprise the theory for relief" (internal quotation marks omitted); *Mun. Utils. Bd. of Albertville*, 934 F.2d at 1501 ("A plaintiff must plead sufficient facts so that each element of the alleged antitrust violation can be identified.")). "A contrary view would be tantamount to providing antitrust litigation with an exemption from Rule 12(b)(6)." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106-07 (7th Cir. 1984).

Although Gravity alleges that Microsoft's agreements with Compaq and Dell individually produced anticompetitive effects, it does not provide any factual basis to support this allegation.[23] Moreover, Gravity has made clear that it has no intention of providing evidence regarding the market power or share of Compaq or Dell; thus, it does not seek additional discovery or factual development with respect to the issue of market share or power. Instead, it asks us to accept its conclusory assertion that Microsoft's agreements with Compaq and Dell, when considered individually, created a likelihood of significant anticompetitive effects in the relevant software markets without regard to Compaq's or Dell's market power or share in the PC market. This we cannot do. "The pleader may not evade [Rule 12(b)(6)] requirements by merely alleging a bare legal conclusion; if the facts do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of antitrust." *Car Carriers, Inc.*, 745 F.2d at 1106 (internal quotation marks omitted). Because Gravity has failed to allege facts which, if true, would establish that the two licensing agreements at issue are unreasonable restraints on trade that caused antitrust injury to consumers, its § 1 and § 2 claims fail as a matter of law. *Cf. Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241, 245 (6th Cir. 1982) ("Since the complaint does not allege facts suggesting that [the manufacturer's] refusal to deal had any significant anti-competitive effect on the market, there is no rule of reason case alleged.").

---

[23]While the dissent notes as "unexceptional" the proposition that a plaintiff may not rely on a bare legal conclusion to avoid dismissal under Rule 12(b)(6), it proceeds to rely solely on Gravity's bare legal conclusions to find its complaint sufficient. *Post* at 37 n.1.

This court recently concluded that the Supreme Court's holding in *Swierkiewicz v. Sorema, N.A.*, 122 S. Ct. 992 (2002), did not alter the basic pleading requirement that a plaintiff set forth facts sufficient to allege each element of his claim. *See Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002) ("Even in these days of notice pleadings a complaint asserting a negligence claim must disclose that each of the elements is present in order to be sufficient." (internal citations and quotation marks omitted)); *see also Swierkiewicz*, 122 S. Ct. at 997 (relying upon a distinction between "evidentiary standards" and "pleading requirement[s]"). As the dissent recognizes, a sufficient allegation of anticompetitive effects is dependent upon Compaq's and Dell's respective abilities to affect competition in the PC market. *Post* at 35 ("[I]f the conspiracy included only minor OEMs, then the conspiracy would presumably have no power to cause significant anticompetitive effects."). Consequently, by failing to allege Compaq's and Dell's market share or power, Gravity has failed to set forth factual allegations necessary to support the basic elements of its §1 and § 2 claims. *See McLain v. Real Estate Bd. of New Orleans*, 444 U.S. 232, 243 (1980) (noting that to establish liability under the Sherman Act, a showing of either an anticompetitive effect or an anticompetitive purpose is necessary).

## IV.   *Illinois Brick*

Even if we agreed with Gravity that it has alleged sufficient claims under § 1 and § 2 for purposes of Rule 12(b)(6), we would affirm the district court's conclusion that Gravity is barred from seeking compensatory damages relief under the indirect purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).[24] A brief review of the evolution of the indirect purchaser rule is helpful to understand its application to Gravity's claims. In *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968), the defendant in a Sherman Act suit, a manufacturer of machinery for making shoes, defended on the ground that the plaintiff, a shoe manufacturer that had bought the

[24]*Illinois Brick*'s indirect purchaser rule, when applicable, bars only compensatory damages relief and does not apply to injunctive relief. *See Cargill, Inc. v. Monfort of Colorado*, 479 U.S. 104, 111 n.6 (1986); *Campos v. Ticketmaster*, 140 F.3d 1166, 1172 (8th Cir. 1998); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 856-57 (3d Cir. 1996).

defendant's machinery, had passed on any monopoly overcharge to its own customers, the wholesale purchasers of its shoes, and hence had not been injured. The Supreme Court held that an antitrust defendant would not be permitted to defend against a damages suit on the ground that the plaintiff had shifted the cost of the defendant's wrongdoing to the plaintiff's customers. The Court explained the rationale for its decision as follows:

> Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable.

*Id.* at 493. The *Hanover Shoe* Court further explained that the plaintiff's customers "would have only a tiny stake" in enforcing the antitrust law. *Id.* at 494.

In *Illinois Brick*, plaintiffs, who were indirect purchasers of concrete blocks, sought to recover damages on the theory that masonry contractors, who incorporated concrete blocks purchased from defendants into walls and other masonry structures, passed on the alleged overcharge for the blocks to general contractors, who incorporated the masonry structures into entire buildings, and that the general contractors in turn passed on the overcharge to plaintiffs in the bids submitted for those buildings. *Illinois Brick*, 431 U.S. at 726-27. The Court extended the *Hanover Shoe* rule and held that only direct purchasers from an antitrust violator can sue for damages, providing two rationales for the rule: it avoids the danger of multiple, "overlapping recoveries" against the original seller by direct and indirect purchasers, and it avoids the "evidentiary complexities and uncertainties" in determining the amount of any overcharge passed through the intermediary to the indirect purchaser. *Id.* at 730-33. The Supreme Court expressly contemplated two exceptions to the indirect purchaser rule:

(1) where the indirect purchaser acquired goods through a preexisting cost-plus contract and (2) "where the direct purchaser is owned or controlled by its customer." *Id.* at 736 & n. 16. *Illinois Brick* left unclear whether there might be exceptions for cases in which the amount of the overcharge that was passed on to a lower tier of purchasers could be determined simply and with mechanical precision, but thereafter, the Supreme Court held that even where the amount of overcharge passed on is clear, allowing indirect purchasers to pursue damages claims would be inconsistent with *Illinois Brick*, and the Court refused to create any new exception. *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 208 (1990). Moreover, in *Utilicorp United*, the Supreme Court cautioned lower federal courts against creating new exceptions to the *Illinois Brick* rule. *Id.* at 216 ("The rationales underlying *Hanover Shoe* and *Illinois Brick* will not apply with equal force in all cases. We nonetheless believe ample justification exists for our stated decision not to carve out exceptions to the direct purchaser rule." (internal quotation marks omitted)).

Despite this admonition, several courts have recognized a "co-conspirator exception" to *Illinois Brick*. *See, e.g.*, *Paper Sys. Inc. v. Nippon Paper Indus.*, 281 F.3d 629, 631-32 (7th Cir. 2002); *Lowell v. American Cyanamid Co.*, 177 F.3d 1228, 1231 (11th Cir. 1999); *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1171 (8th Cir. 1998); *In re Brand Name Prescription Drugs*, 123 F.3d at 604-05; *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1211 (9th Cir. 1984). Gravity asserts that these cases stand for the proposition that *Illinois Brick* is inapplicable when any conspiracy has been alleged, but we interpret these cases as standing for the more narrow proposition that *Illinois Brick* is inapplicable to a particular type of conspiracy — price-fixing conspiracies. *Cf. McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 854-55 (3d Cir. 1996) (refusing to adopt a co-conspirator exception where plaintiffs have not alleged that the intermediaries immediately upstream colluded to overcharge). Were we to adopt Gravity's broader interpretation, the *Illinois Brick* rule would be inverted solely based upon artful pleading. Such a result is contrary to *Illinois Brick* itself as well as the Supreme Court's clear directive in *Utilicorp United* against crafting new exceptions to the *Illinois Brick* rule. Far more reasonable is the proposition that, to the extent a court were to recognize a co-conspirator exception to *Illinois Brick*, such an exception would be grounded on the damages theory underlying the alleged

conspiracy. For example, the rationale for concluding that *Illinois Brick* does not apply to a price-fixing conspiracy is that no overcharge has been passed on to the consumer: When a dealer has illegally conspired with a manufacturer with respect to the price paid by a consumer, then "the consumer is the only party who has paid any overcharge." 2 Areeda & Hovenkamp ¶ 371h, at 264. We need not resolve whether we would recognize a co-conspirator exception to *Illinois Brick*'s indirect purchaser rule for a price-fixing conspiracy because no such conspiracy has been alleged here. Instead, Gravity's compensatory damages claim is premised on an attempt to recover for Microsoft's illegal overcharge that allegedly was passed on to Gravity. Accordingly, Gravity's claim is materially indistinguishable from the claim under consideration in *Illinois Brick*, and its inclusion of a conspiracy allegation is insufficient to circumvent the *Illinois Brick* rule.

Nevertheless, Gravity argues that *Illinois Brick* ought not to control because the policy concerns underlying *Illinois Brick* are not implicated here. First, Gravity contends that there is no danger of duplicative recovery because the OEMs "apparently have elected not to sue Microsoft." (Appellant's Br. at 69.) The Supreme Court in *Illinois Brick*, however, "recognize[d] that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers." *Illinois Brick*, 431 U.S. at 746. Yet, the majority concluded that "on balance . . . the legislative purpose in creating a group of private attorneys general to enforce anti-trust laws . . . is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed part of it." *Id.* (internal quotation marks omitted).

Gravity also argues that its claims do not require the complex task of price-tracing because the consumers' damages are the difference between the "but-for" price that they would have paid for the Windows software absent the illegal conspiracy and the amount they actually paid for it. This argument misses the point, in that to calculate the "but-for" price, the court would be required to determine the overcharge, if any, for Microsoft's software that was passed on to consumers — the exact analysis that *Illinois Brick* forbids.

Finally, Gravity suggests that, to the extent there is any difficulty in apportioning damages, the court could avoid this difficulty by awarding 100% of the overcharge to the consumer. Gravity does not explain, however, why consumers should be awarded a windfall. At bottom, Gravity's policy arguments are virtually identical to those raised by Justice Brennan in his *Illinois Brick* dissent. *Id.* at 748-65 (Brennan, J., dissenting). Of course, they were considered and rejected by the majority in formulating the indirect purchaser rule, and we are not at liberty to reevaluate those policy choices here. Accordingly, we conclude that *Illinois Brick* bars Gravity's claims for compensatory damages for the alleged § 1 and § 2 violations.

V.

We conclude that Gravity's § 1 and § 2 claims fail as a matter of law and that, in any event, *Illinois Brick* bars Gravity's ability to recover compensatory damages. Thus, we affirm the judgment of the district court.

*AFFIRMED*

GREGORY, Circuit Judge, dissenting:

I agree with the majority, *ante* at 8, that Gravity's § 1 claims need not meet the more rigorous standards of § 2 of the Sherman Act. However, I respectfully dissent. Whether or not Gravity would succeed on the merits, it has clearly stated claims under both § 1 and § 2 of the Sherman Act.

I.

The majority makes its first error when it rejects Gravity's allegations of a single conspiracy, relying on *Kotteakos v. United States*, 328 U.S. 750, 755 (1946). In *Kotteakos*, the Supreme Court rejected one articulation of a "rimless wheel" conspiracy. The conspiracy envisioned—and rejected—by *Kotteakos* states: "A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's

involvement in each transaction." *Ante*, at 9. The majority says that because the *Kotteakos* Court rejected a variant of a "rimless wheel" conspiracy, we must too. The problem with that reasoning is that Gravity is *not* arguing that we should adopt the specific definition of conspiracy that was rejected in *Kotteakos*.

In *Kotteakos*, the underlying crime was conspiracy to obtain loans under the National Housing Act by false and fraudulent statements. The center of the conspiracy was a man named Brown, who was in the business of brokering fraudulently obtained loans for his co-conspirator clients. 328 U.S. at 753. All of the clients used Brown to obtain the loans, but each client's use of Brown's services was independent of every other client's use. *Id. Kotteakos* involved not one, but multiple conspiracies. Not only did Brown's co-conspirators have no express agreements among themselves, their participation was also in no way *dependent* on the participation of other users of Brown's services. The Court drew upon an analogy offered by the court of appeals to explain the point: "Thieves who dispose of their loot to a single receiver—a single 'fence'—do not by that fact alone become confederates: they may, but it takes more than knowledge that he is a 'fence' to make them such." *Id.* at 755.

In contrast to *Kotteakos*, Gravity outlined the elements of a "rimless wheel" conspiracy as follows:

> (1)   that there is an overall-unlawful plan or common design in existence;

> (2)   that knowledge that others *must be involved* is inferable to each member because of his knowledge of the unlawful nature of the subject of the conspiracy[,] but knowledge on the part of each member of the exact scope of the operation or the number of people involved is not required; and

> (3)   there must be a showing of each alleged member's participation.

*Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*, 459 F.2d 138, 146-47 (6th Cir. 1972) (emphasis deleted and added); *Impro*

*Prods., Inc. v. Herrick*, 715 F.2d 1267, 1279 (8th Cir. 1983) (quoting *Elder-Beerman*). Whether we should adopt this test *in toto* I would not decide today, but I believe that this definition of a "rimless wheel" conspiracy is useful for purposes of this case, and is consistent with well-established interpretations of the Sherman Act.

The critical difference between the test Gravity urges, and the test *Kotteakos* rejected lies in the requirement "that knowledge that others must be involved is inferable to each member because of his knowledge *of the unlawful nature of the subject of the conspiracy*" (emphasis added). *Id*. Gravity has alleged that the nature of the conspiracy, by design and by necessity, was broader than any one agreement between Microsoft and an OEM, and that knowledge of that interdependent design was inferable to each member of the conspiracy. Regardless of whether any OEM desired the participation of other OEMs (and they conceivably might have), Gravity alleges that each OEM joined a conspiracy which it knew was, by its nature, broader than just itself and Microsoft.

These allegations are plainly sufficient to state a claim under the Sherman Act. The law has been clear that there need not be an express agreement between every conspirator in order for a single conspiracy to be formed. *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939) ("[I]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators"); *see also United States v. Masonite Corp.*, 316 U.S. 265, 275 (1942) ("Here, as in *Interstate Circuit*, . . . [i]t was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it."); *United States v. Tillett*, 763 F.2d 628, 632 (4th Cir. 1985) (stating that plaintiff must show that each alleged conspirator "participated in the conspiracy with knowledge of the essential nature of the plan.").

In *Interstate Circuit, Inc. v. United States*, film exhibitors suggested that film distributors insert clauses into their distribution contracts requiring minimum ticket prices for certain films. The distributors accepted the suggestion nearly unanimously. The Court held that an agreement among the distributors could be inferred:

> Each [distributor] was aware that all were in active competi-
> tion and that without substantially unanimous action with
> respect to the restrictions . . . there was risk of a substantial
> loss of the business and good will of the . . . exhibitors, but
> that with it there was the prospect of increased profits.

306 U.S. at 222. Such is the case with the OEMs. It takes no stretch
of logic to infer that the OEMs knew that Microsoft's plans contem-
plated the cooperation of other OEMs. It is the agreement to partici-
pate in this common plan that formed a single conspiracy.
"Acceptance by competitors, without previous agreement, of an invi-
tation to participate in a plan, the necessary consequence of which, if
carried out, is restraint of interstate commerce, is sufficient to estab-
lish an unlawful conspiracy under the Sherman Act." *Interstate Cir-
cuit*, 306 U.S. at 227. Thus, I would find that the allegations are
sufficient to state a claim.

## II.

The majority next finds that Gravity has failed to allege "facts
which, if proven true, would establish that the two conspiracies sepa-
rately imposed unreasonable restraints of trade in interstate com-
merce." *Ante*, at 13. Even if I agreed that there were two conspiracies
and not one alleged in this case, there is no question that Gravity's
pleadings are more than adequate.

The majority requires far more from Gravity than is appropriate
under notice pleading standards. Aside from a statement of jurisdic-
tion and a demand for relief, Federal Rule of Civil Procedure 8(a)
requires nothing more than "a short and plain statement of the claim
showing that the pleader is entitled to relief[.]" 122 S.Ct. 992, 997.
The elements for a claim of conspiracy to restrain trade in violation
of § 1 of the Sherman Act are (1) concerted action that (2) unreason-
ably restrains trade. *Estate Constr. Co. v. Miller & Smith Holding
Co.*, 14 F.3d 213, 220 (4th Cir. 1994); *Oksanon v. Page Memorial
Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991). According to the majority,
Gravity has not adequately pled the second element, an unreasonable
restraint of trade, because Gravity failed to plead the market shares
of the OEMs. This is necessary, the majority says, because Gravity
must prove the OEMs' individual market power in order to prove the

conspiracy's market power. The conspiracy's market power, in turn, is required to prove the potential for anticompetitive effects, which is part of Gravity's burden to satisfy the "rule of reason."

The majority's pleading standard conflicts with the Supreme Court's recent pronouncement on federal pleading requirements. "[U]nder a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case." *Swierkiewcz v. Sorema, N.A.*, 534 U.S. 506, 122 S.Ct. 992, 997 (2002). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Id.* at 998. "Rule 8(a)'s simplified pleading standard applies to all civil actions, with certain exceptions." *Id.* Thus, the Supreme Court has made crystal clear, just this past term, that an evidentiary standard does not determine the adequacy of a complaint. *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S.Ct. 992, 997 (2002). It is inappropriate, therefore, to require plaintiffs to plead facts going to that evidentiary standard in a complaint.

While I agree that liability in this case, in all likelihood, would be determined under the "rule of reason" standard, *see, e.g., Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977), it seems to me that the "rule of reason" is an evidentiary standard, not a pleading requirement. Courts ordinarily have to undertake a factual inquiry before it is determined whether the "rule of reason" or *per se* rules apply. If *per se* rules apply, then anticompetitive effects do not matter. *See United States v. W.F. Brinkley & Son Constr. Co., Inc.*, 783 F.2d 1157, 1162, n.10 (4th Cir. 1986) (noting this circuit recognizes *per se* antitrust violations and, in doing so, there is no requirement of proof of anticompetitive results). The conduct is illegal regardless of proof of effects. *Id.*

Additional specificity regarding the OEMs' market power is not necessary. While anticompetitive effect is often proven through analysis of the relevant market definition and market power, it can also be proven through *actual* anticompetitive effects. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); VII P. Areeda, Antitrust Law § 1511, p.429 (1986). The Supreme Court made clear that it is inappropriate to require a plaintiff to plead facts which he may not need to succeed on the merits of the claim. *Swierkiewicz*, 122

S.Ct. at 997 (holding that plaintiff need not plead facts establishing a prima facie case of employment discrimination, in part because it would be "incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered"). Gravity has pled actual anticompetitive effects. *See* Compl. ¶¶ 4, 59, 62-63, 68-69, 91-92, 95, 107, 115-117, 123-124, 150, 152, 154-156. Accordingly, the complaint should withstand a motion to dismiss.

To the extent that Gravity intends to rely on market power to demonstrate the likelihood of significant anticompetitive effects, the relevant issue is whether the *conspiracy* had market power in the software markets, not whether the defendant OEMs had market power in the PC hardware market. Gravity has adequately pled the conspiracy's market power. *See, e.g.,* Compl. ¶ 150 ("Microsoft and these named co-conspirators have the power to control prices or exclude competition in these relevant markets and have committed overt acts in furtherance of their conspiracy to monopolize."); *id.* ¶ 152 ("[The OEMS] are Microsoft's three largest distributors in the relevant market for Microsoft operating software, and among Microsoft's very largest distributors in the relevant markets for the sale of personal computer word processing and spreadsheet software. As participants in these markets they have joined Microsoft in extensive licensing and other agreements with the purpose and effect of monopolizing and restraining trade in these relevant markets, and they have benefitted substantially from this common anticompetitive scheme.").

The Court finds Gravity's allegations of market power deficient, but only because it misunderstands Gravity's argument regarding market power. According to the majority, Gravity argued on appeal that Microsoft's monopoly is the only relevant factor in determining whether the conspiracy had the power to harm competition. This is not correct. Gravity has asserted that the district court was wrong to require it to plead that each OEM defendant had sufficient market power in the hardware market to cause the injury alleged, pointing out that the relevant market is software, and the relevant entity is the conspiracy (either a bilateral or single conspiracy). Appellant's Br. at 46, 48, 49; *id.* at 50 ("The district court erred in assessing only Compaq's or Dell's market power rather than the market power of the combina-

tions between each of them and Microsoft."). It is clear that Gravity understands the importance of the OEMs, and the pleadings, read in the light most favorable to Gravity, do not suggest otherwise. *See also* Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice.").

Setting aside any confusion regarding Gravity's argument, the majority has identified an important issue concerning market power. While Microsoft has a monopoly in the relevant software markets, if the conspiracy included only minor OEMs, then the conspiracy would presumably have no power to cause significant anticompetitive effects. *See ante*, at 19 n.20. The parties dispute whether this should be treated as a liability issue or a causation issue, Appellants' Br. at 7; Appellees Compaq, Dell, and PB Electronics' Br. at 28, and the majority does not resolve the dispute, *ante* at 18 n.19. The heading under which the issue should go is ultimately irrelevant because the majority identifies only a single deficiency in Gravity's pleadings: failure to plead the defendant OEMs' market shares in the PC market. *Ante* at 22. Yet this is not enough to entitle the defendants to a dismissal.

The complaint identifies the OEMs involved, states that they are Microsoft's largest OEM distributors, identifies the asserted anticompetitive conduct, states that the conspiracy's anticompetitive conduct had significant anticompetitive effects, and identifies the effects. Moreover, Microsoft is an adjudicated monopolist, with clear market power in the relevant software markets, and the defendant OEMs are among the largest players in the PC hardware market. There is simply no conceivable argument from which one could conclude, based solely on a failure to plead market share, that the defendants are not on notice of the claims against them and the grounds on which they rest. *See Conley*, 355 U.S. at 48 ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."). The OEMs' specific market power in the PC market is, at best, a subsidiary fact.

The majority cites a number of cases involving pleading standards. *See ante* at 23-24. None of those cases, however, support the holding

in this case. For example, it is true that in *Advanced Health-Care Services, Inc. v. Radford Community Hospital*, 910 F.2d 139 (4th Cir. 1990), we stated that a plaintiff must "colorably state[] facts which, if proven, would entitle him to relief." *Id.* at 145 n.8. But, in that case, we *reversed* the district court's dismissal of the complaint, acknowledging that "the Supreme Court has stated that 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.' *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 747 (1976)." *Id.* at 144. Lack of specificity in the complaint was not the concern of that case. This Court never suggested that a plaintiff must plead detailed facts supporting every subsidiary factual conclusion. To the contrary, we employed a decidedly permissive standard for judging the adequacy of the complaint. In *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213 (4th Cir. 1994), we confirmed that a complaint must provide "sufficient facts so that each element of the alleged antitrust violation can be identified," *id.* at 222 (internal quotation and citation omitted); but we never suggested that detailed, underlying facts are required in the complaint. Rather, our concern was with overly vague factual allegations and mere legal conclusions unsupported by any facts.

The full Sherman Act allegations in that case read as follows:

> Providence combined and/or conspired with the Miller & Smith defendants, Gordon V. Smith, Calloway, Connor, Jack B. Conner Associates, Inc. and others to restrain trade unreasonably in the Washington, D.C. metropolitan area by combining and/or conspiring to deprive the Pattersons of The Property, cause The Property to be sold in foreclosure at a price that would leave the Pattersons with no assets, and otherwise to drive them and Estate Construction out of the real estate development business in the Washington, D.C. metropolitan area. The combination and/or conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market. The objects and conduct of the combination and/or conspiracy were illegal.

14 F.3d at 221 n.15. We held that a plaintiff must "provide, whenever possible, some details of the time, place and alleged effect of the conspiracy; it is not enough merely to state that a conspiracy has taken

place." *Id.* at 221. Gravity's claims, in contrast, are replete with all manner of detail—fifty-eight pages of detail.[1] The defendants in this case know *exactly* what conduct is alleged to have violated the antitrust laws, which is all that Rule 8 requires. It is not for us to change the rules of civil procedure mid-stream. "A requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." *Swierkiewicz*, 122 S.Ct. at 999.

### III.

Finally, the majority holds that the direct purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), precludes recovery. I disagree, and would join the Seventh, Ninth, and Eleventh Circuits, each of which has held that it does not. *Paper Systems, Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629 (7th Cir. 2002); *Lowell v. American Cynamid Co.*, 177 F.3d 1228, 1233 (11th Cir. 1999) ("*Illinois Brick* simply does not apply where the complaint alleges a vertical conspiracy with no pass-on."); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 604 (7th Cir. 1997) (Posner, C.J.) ("[A]ny indirect-purchaser defense would go by the board since the [plaintiffs] would then be direct purchasers from the conspirators."); *Arizona v. Shamrock Food Co.*, 729 F.2d 1208, 1212-14 (9th Cir. 1984); *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 481 (7th Cir. 1980); *see also* II Phillip E. Areeda et al., *Antitrust Law* ¶ 346h, at 369 (2d ed. 2000) ("Whether one adopts a co-conspirator exception or regards this situation as outside *Illinois*

---

[1] The majority also parenthetically quotes *Mun. Utils. Bd. of Albertville v. Alabama Power Co.*, 934 F.2d 1493, 1501 (11th Cir. 1991): "A plaintiff must plead sufficient facts so that each element of the alleged antitrust violation can be identified." *Ante* at 24. But the majority omits the important qualifier contained in the same paragraph: "However, the alleged facts need not be spelled out with exactitude, nor must recovery appear imminent." *Mun Utils. Bd*, 934 F.3d at 1501. Finally, *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (8th Cir. 1984), stands for the unexceptional and well-worn proposition that a plaintiff must at least "outline or adumbrate" a violation of the Sherman Act, instead of relying on a bare legal conclusion. *Id.*

*Brick*'s domain, there is no tracing or apportionment to be done."); *cf. McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) (noting exception but declining to apply it because the upstream suppliers were not joined as defendants); *In re Beef Antitrust Litig.*, 600 F.2d 1148, 1163 (5th Cir. 1979) (same); *Jewish Hosp. Ass'n v. Stewart Mech. Enters.*, 628 F.2d 971, 977 (6th Cir. 1980) (noting exception but declining to apply it because vertical conspiracy allegations failed).

The decision in *Hanover Shoe* was motivated by the Court's desire to maximize deterrence by allocating the right to sue to the most efficient enforcer of antitrust law. The rationale was that indirect purchasers have a comparatively small injury, and consequently less incentive to sue. *Hanover Shoe*, 392 U.S. at 494; *Illinois Brick*, 431 U.S. at 745. A passing-on defense would make litigation less effective for direct purchasers as well, given the reduction in recovery as well as the complexities of apportioning damages between direct and indirect purchasers. *Hanover Shoe*, 392 U.S. at 493. *Illinois Brick* is the logical corollary to *Hanover Shoe*. In *Illinois Brick*, the Court denied "passed-on" damages to indirect purchasers of a manufacturer's goods. Because of *Hanover Shoe*, failure to deny recovery for such damages would lead to duplicative recovery. *Illinois Brick*, 431 U.S. at 730-31. The two cases therefore ensure full recovery while maximizing deterrence and avoiding duplicative recovery.

Permitting plaintiffs such as Gravity to sue intermediaries that were part of a conspiracy to raise *retail* prices above a competitive level is consistent with *Hanover Shoe* and *Illinois Brick*. As Judge Easterbrook recently wrote for the Seventh Circuit: "The right to sue middlemen that joined the conspiracy is sometimes referred to as a co-conspirator 'exception' to *Illinois Brick*, but it would be better to recognize that *Hanover Shoe* and *Illinois Brick* allocate to the first non-conspirator in the distribution chain the right to collect 100% of the damages." *Paper Sys.*, 281 F.3d at 631-32. This is the correct reading of *Hanover Shoe* and *Illinois Brick*. It maximizes deterrence by giving the right to sue to the plaintiff with the most incentive to sue. As for any lingering doubt over whether the conspiring intermediary is the best plaintiff, or concern regarding multiple recovery, the case law has rightly recognized the importance of joining the intermediary in the suit—a requirement which has been met in this case. *See, e.g.,*

*McCarthy*, 80 F.3d at 855; *In re Beef Antitrust Litig.*, 600 F.2d at 1163; *In re Midwest Milk Monopolization Litig.*, 730 F.2d 528, 531 (8th Cir. 1984).

The majority rejects the cases that have unanimously recognized a direct purchaser's right to sue, saying that those cases dealt with price-fixing conspiracies. I think that this case presents a substantially identical situation. Gravity is not complaining about any overcharge paid by the OEMs to Microsoft. Rather, Gravity is complaining about the conspiracy's ultimate overcharge of the consumer. Gravity actually argues that the defendant OEMs received discounts on software purchased from Microsoft. In other words, Microsoft shared some of the monopoly profits with the OEMs. If one were to assume that Microsoft gave *all* its monopoly profits to the OEMs then there would be no pass-on. The OEMs would simply be overcharging consumers, like in a resale price maintenance scheme. How much of its monopoly profits Microsoft retained is merely a matter of how the conspirators allocated the fruits of their alleged illegality, and is not directly relevant to Gravity. The damages that Gravity is seeking to prove are the difference between the price consumers actually paid for the Windows software and the "but for" price.

Much of the difficulty in calculating the "but for" price will come from disaggregating the price of PC hardware from the Microsoft software. This difficulty, however, is not the concern of *Illinois Brick*. It can occur when there is no middleman. It would occur, for example, if Microsoft built and sold its own brand of Windows-operated PC. Mere difficulty in measuring damages is not a reason to preclude recovery. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) ("[I]n cases where a wrongdoer has incorporated the subject of a plaintiff's patent or trade-mark in a single product to which the defendant had contributed other elements of value or utility . . . this Court has sustained recovery of the full amount of defendant's profits where his own wrongful action has made it impossible for the plaintiff to show in what proportions he and the defendant have contributed to the profits") (citations omitted); *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) ("[I]t does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which has itself inflicted.") (quotation omitted).

Aside from the problem of disaggregation, calculating the "but for" price may involve determining elasticities of supply and demand—the complexity identified by *Illinois Brick*—but no more so than in any of the other cases in which middlemen conspired with manufacturers. And there will be no duplicative liability. Moreover, determining elasticities of supply and demand can complicate any attempt to measure damages—"it is not occasioned solely by the presence of intermediaries." *Paper Sys.*, 281 F.3d at 633. The real concern of *Hanover Shoe* and *Illinois Brick* is the complexity of measuring the pass-on of an *actual* overcharge, and its potential negative effect on deterrence and compensation, not the mere difficulties of determining what the price would have been in a competitive market.[2] The majority's rule is essentially a free pass to any conspiracy that can make the damage it inflicts difficult to pin down. Until now, that has never been the law.

The majority reasons that adopting Gravity's argument would lead plaintiffs to plead a conspiracy that did not exist in order to evade *Illinois Brick*. Yet, there are mechanisms, primarily Rule 11, to deal with the abusive and unethical conduct of litigants and lawyers. I find troubling the majority's unhesitating willingness to cut off compensation to *all* injured consumers based on hypothetical abuses of liberal pleading rules. The interests of consumers are far more weighty than the majority is willing to recognize. Moreover, the concern about "artful pleading" has nothing whatsoever to do with *Illinois Brick* and *Hanover Shoe*. The direct purchaser rule is designed to *encourage* and *incentivize* private enforcement of the antitrust laws, not immunize corporate wrongdoers from having to litigate antitrust claims.

## IV.

The most unfortunate aspect of this case is that, to the extent Gravity's claims have merit, consumers will be left uncompensated. Even more, raising the procedural bar for consumers' claims may further stifle technological innovation. By giving comfort to those entrenched

---

[2]To the extent that the litigation subsequently revealed true *Illinois Brick* issues, such as if the defendant OEMs switched sides and sued Microsoft, *see Paper Sys.*, 281 F.3d at 632, I agree that *Illinois Brick* might then require dismissal of Gravity's claims.

interests that seek to protect the status quo, today's decision increases the likelihood of future anticompetitive conduct. To those who would introduce disruptive technologies, this ruling creates a strong disincentive to innovate. Without innovation, we all lose. I respectfully dissent.